UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Robin D. Camlin, | ) | C/A No. 4:14-3388-RBH-KDW |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| South Carolina Department of Natural Resources, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Robin D. Camlin ("Plaintiff" or "Camlin") filed this action against her employer, Defendant South Carolina Department of Natural Resources ("Defendant" or "DNR"), alleging DNR violated Title VII of the Civil Rights Act of 1964, as amended, when it failed to promote her to the position of Lieutenant-Investigations ("L-I"). At the close of discovery, Defendant moved for summary judgment. ECF No. 46. Plaintiff responded to the Motion, ECF No. 50; and Defendant filed a reply, ECF No. 64. This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a report and recommendation ("Report") regarding Defendant's pending dispositive motion. Having reviewed the parties' submissions and the applicable law, the undersigned recommends Defendant's Motion, ECF No. 46, be *granted and this matter be ended*.

I.    Factual background[1]

A.  DNR organization

Plaintiff is employed by DNR in the Investigations Section of its Law Enforcement Division ("LE"). In addition to the Investigations Section, the LE Division has field offices and an

---

[1] To the extent supported by the record and germane to this Motion, the court considers the facts in the light most favorable to Plaintiff, the nonmoving party, and potentially differing accounts of events are noted. Here, some of the background facts are derived from Defendant's Motion and were not addressed by Plaintiff. Further, some of the information Plaintiff included in her Statement of Facts is better addressed in the context of her arguments below.

administrative division. Within the Administrative Division is the Education Section, which provides education and outreach. DNR's Investigations Section includes overt (uniformed) investigators, covert operations (undercover), marine theft, and aids to navigation. The Section also conducts the marine event program, boating saturation ("BSAF") team, abandoned boat program, river-shack program, basic marine law enforcement training, and boat accident data entry. Investigative activity within the Investigations Section includes, but is not limited to: boating fatalities, hunting fatalities, marine theft, aids to navigation, regulatory, aquatic investigations and recovery, background checks, and internal staff investigations. The Investigations Section is a standalone area led by Captain Gary Sullivan, who reports directly to Colonel Chisolm Frampton, who is Deputy Director over the LE Division. Colonel Frampton reports to DNR Executive Director Alvin Taylor. *See* Affidavit of DNR Human Resources ("HR") Director Terri McGee ["McGee Aff."], ECF No. 46-2 at 2, 6. [2]

B.  The L-I position at issue

Plaintiff's sole cause of action is one for Title VII[3] gender discrimination. Plaintiff alleges she was not promoted to the L-I position at issue because of her gender. As set out in the Job Announcement or "Posting", the L-I position has responsibility for the supervision of all overt law enforcement investigations and programs. The L-I is expected to supervise and direct the majority of staff in the Investigations Section, assist with Section duties, assign investigators, complete work schedules, manage equipment and inventory, supervise marine events, prepare reports, approve time

---

[2] Included in the documents attached to McGee's affidavit is position statement DNR submitted to the South Carolina Human Affairs Commission ("SHAC") in response to Plaintiff's Charge. McGee prepared and signed the statement on behalf of DNR, and she testifies under oath of its accuracy. McGee does not repeat the facts in the body of her proffered affidavit. Except for material facts Plaintiff challenges with competent evidence, the undersigned considers information in the position statement to be competent in setting out background facts as to which McGee has knowledge.

[3] To the extent Plaintiff brings gender discrimination claims pursuant to South Carolina Human Affairs Law ("SCHAL"), the analysis is the same. *See Orr v. Clyburn*, 290 S.E.2d 804, 806 (S.C. 1982) (noting SCHAL essentially follows the substantive structure of Title VII and that cases interpreting Title VII are given persuasive if not binding authority).

sheets and schedule staff training. McGee Aff. ¶ 5 & attached documents, ECF No. 46-2 at 2, 12-14.

The Posting sets out the following pertinent information:

> Minimum and Additional Requirements:
>
> Internal Posting for DNR Employees Only
>
> Five (5) years experience as a DNR Law Enforcement Officer. Prefer one (1) year of DNR LE Officer experience in a supervisory position in DNR Law Enforcement.
>
> Additional Comments:
>
> Internal Posting for DNR Employees Only
>
> Possess a thorough understanding of title 50 code of laws and federal laws that apply to Section Programs or Enforcement issues. Must be knowledge[able] of the legislative process. Must be focused strong management and leadership skills.

ECF No. 46-2 at 12-14.

The L-I position had been held by Gary Sullivan for years. In December 2011, Sullivan was promoted to Captain, but retained supervisory duties over all Investigators. During that time, there was not an L-I position. Management decided to create a new L-I position, which was posted for applications on October 3, 2012. Captain Sullivan was the hiring manager, and the new L-I would report to him. Sullivan, with McGee's assistance, created the position description and Posting, assembled an interview panel (discussed more thoroughly below), scheduled interviews, chose questions to be asked, determined how the candidates would be rated, and determined which candidate to recommend to Colonel Chisolm Frampton for LE Division-level approval. Once Colonel Frampton and the HR Director approved the recommendation, DNR Executive Director Alvin Taylor would consider the recommendation and make the final decision. This chain-of-command consideration was followed in filling the L-I position. *See* ECF No. 46-2 at 12-14, Sullivan Dep. 41-42.

C.  The applicants

Six individuals applied for the L-I position. As it is uncontested that Plaintiff and Investigator Larry Donald Pritcher ("Pritcher") were the top two candidates, *see* Sullivan Dep. 67, the court focuses only on them.

1.    Plaintiff's background

DNR's predecessor agency hired Plaintiff in 1990 as a field/conservation officer in the LE Division—a position she held until 1998. Pl.'s Dep. 3-4, ECF No. 46-7. Plaintiff's job responsibilities involved the enforcement of state and federal wildlife and boating laws, litter laws, and regulations. Plaintiff also presented programs to schools and organizations. *See* Pl.'s Resume, ECF No. 46-2 at 22-26. In 1998, Plaintiff applied for, interviewed, and received a position as an Education Officer in the Hunter and Boater Education Section of the LE Division. Pl.'s Dep. 6-8. In 2007, Plaintiff applied for, interviewed, and received a position as an Investigator in the LE Division of DNR. She held the rank of sergeant at that time. *Id.* at 10. During the 2007 interview process Sullivan was the L-I of the Investigations Section, served on that interview panel, and recommended Plaintiff be selected for the investigator position. Plaintiff remains in that investigator position today. *Id.* at 10-11.

2.    Pritcher's background

DNR's predecessor agency hired Pritcher as a Boating Education Officer in the LE Division in September 1986. He held that position until 1992, at which time he became a Boating and Hunting Education Officer for DNR. *See* Pritcher Resume, ECF No. 46-2 at 34-35. In May 1997, Pritcher was selected to join DNR's first Investigations Section as an Investigator, where he remains. *Id.* In addition to investigative duties, Pritcher's duties included working on the Aids to Navigation Program. *Id.*

D.  The interview process

DNR's LE Division's Directive D348 sets out its Officer Promotion Plan. *See* ECF No. 46-2 at 27-29. In addition to other directives, the Plan provides for a Promotion Board, comprised of "the Captain, if appropriate 2) the appropriate Major, 3) the Lieutenant Colonel, and 4) a representative from the Office of Human Resources," to interview applicants for investigator positions not assigned to particular regions. *Id.* at 28. The Promotion Board is often referred to as the "Panel."

The Panel for the L-I position consisted of three individuals: Captain Sullivan, who is Captain over the Investigations Section and the hiring manager; Mike Sabaka, who is an Administration Captain with experience in the Investigations Section; and HR Manager Stephanie Welch. ECF No. 46-2 at 8. Captain Sabaka was selected for the Panel because of his experience and because the Investigations Section did not have a Major, and the LE Division did not have a Lieutenant Colonel, as D348 had contemplated. *Id.,*[4] Sullivan Dep. 51.

Sullivan selected Captain Sabaka to serve on the panel because of Sabaka's interest and experience in Investigations. *Id*. at 47, 62-63. Sullivan recalled that he and Sabaka had served on a prior interview panel. *Id.* at 61-62. Although DNR Directive 348 II.B.4.b (D348) called for a lieutenant colonel and an "appropriate major" to sit on the Panel, there was neither over the Investigations Section at that time. Sullivan testified that, other than Executive Director Taylor, Captain Sabaka was the highest ranking DNR officer knowledgeable about investigations at that time. *Id.* at 50-51, 133-34. Sabaka had worked directly with both Sullivan and Pritcher. Sullivan Dep. 17-20. Sabaka had gone through basic training with Plaintiff and had worked with Plaintiff on occasion prior to 2012; however, he noted he had not worked directly with Plaintiff when she was an Investigator. Sabaka Dep. 35, 45, ECF No. 46-5. Sabaka did recall investigating a marine fatality with Plaintiff, although he did not recall many specifics of that interaction. *Id.* at 39-41.

---

[4] As discussed below, Plaintiff takes issue with the composition of the Panel.

McGee recommended Stephanie Welch as the HR representative for the Panel. Sullivan approved and chose Welch, noting she had previously worked in the marine-theft office. Sullivan Dep. 47, 55. He was also aware Welch had worked with Pritcher in the marine-theft office. *Id.* at 55. Sullivan had no knowledge of Welch's prior experience serving on interview panels. *Id.* at 61.

As the hiring manager, Captain Sullivan devised questions to be asked of the candidates during their interviews, and identified critical "competencies," or job requirements on which the Panel would rate the candidates using a one-to-six scale: 1) Job Knowledge/Responsibilities; 2) Planning; 3) Organizing; and 4) Supervisory & Leadership Potential. Sullivan Dep. 68-74.[5] Sullivan wanted to select the best person for L-I position and believed the most important qualities for the position were "[o]verall job knowledge, overall section knowledge, overall ability to do those jobs and to know how they're done, experience as an investigator and [as] a DNR officer." *Id.* at 90-91.

E.  The interviews

On October 24, 2012, Captain Sullivan, Captain Sabaka, and Stephanie Welch interviewed six applicants, including Plaintiff and Investigator Pritcher. Pritcher was the successful applicant. The interviewers each completed "Applicant Evaluation Forms" on which they gave each candidate scores in the four job-related competencies. The numerical scores given by each are set out in the following table:[6]

| | | Investigator Pritcher | | | Investigator Camlin (Plaintiff) | | |
|---|---|---|---|---|---|---|---|
| | | Sullivan | Welch | Sabaka | Sullivan | Welch | Sabaka |

---

[5] As Welch explained, in hiring for any position the hiring manager determines the job-related competencies specific to that position. Welch Dep. 54.

[6] Both Plaintiff and Defendant included a similar compilation table. *See* Def.'s Mem. 5, Pl.'s Mem. 20. The Applicant Evaluation Forms and the interviewers' handwritten notes concerning the questions asked during the interviews are available as exhibits to McGee's affidavit. *See* ECF No. 46-2 at 36-41 (Sullivan concerning Pritcher), 42-48 (Welch concerning Pritcher), 48 (Sabaka concerning Pritcher), 54-60 (Sullivan concerning Plaintiff), 60-66 (Welch concerning Plaintiff), 66-71 (Sabaka concerning Plaintiff).

| Job Knowledge/ Responsibilities | 5 | 6 | 5 | 4 | 5 | 4 |
|---|---|---|---|---|---|---|
| Planning | 6 | 6 | 6 | 4 | 4 | 4 |
| Organizing | 6 | 6 | 6 | 5 | 5 | 5 |
| Supervisory & Leadership Potential | 5 | 5 | 5 | 5 | 5 | 5 |
| Total | 22 | 23 | 22 | 18 | 19 | 18 |

Pritcher and Camlin were the two highest-scoring applicants. ECF No. 46-2 at 8. Each Panel member gave Pritcher a higher score than Camlin overall and in three of the four competencies, and the Panel unanimously concurred that Pritcher was the best qualified candidate for the position. Captain Sullivan recommended to Colonel Frampton that Pritcher be selected to fill the L-I position. Colonel Frampton, the HR Director, and Executive Director Taylor approved the recommendation.

F. The Panel members' evaluations of Pritcher and Plaintiff

1. Sullivan

In an October 25, 2012 memorandum, Captain Sullivan wrote the following to Colonel Frampton concerning his hiring recommendation:

> This memo is to advise you that my selection for the above listed position is SSGT Larry Donald "Donnie" Pritcher Jr. SSGT Pritcher has all of the necessary abilities, skills and knowledge desired to perform the expected job duties outlined in the position description. SSGT Pritcher's long tenure in the section makes him a great selection and he has experience in every job duty or function based on his tenure. I expect that SSGT Pritcher's transition from the field into an administrative position will be smooth because he is already familiar with and has performed some of the administrative duties in my absence or during times when the section was short staffed. If you have any questions or concerns with my selection please let me know.

ECF No. 46-3 at 28.

Also on October 25, 2012, Sullivan completed a "Justification Summary Sheet," regarding successful applicant Pritcher. These sheets are routinely requested by HR. Sullivan's sheet regarding Pritcher provided as follows:

> 1) What knowledge, skills, and abilities does this applicant have that make him/her capable of performing this job?
>
> The above applicant has the most detailed knowledge of the job duties and section responsibilities over all of the other applicants. The applicant has the longest tenure in the section and has throughout his career done all of the job duties and functions within the section. The applicant possesses all of the skills necessary to do the job expected of him and has exhibited those skills, decision making, dependability, knowledge and problem solving to name a few, while doing his existing job duties.
>
> 2) What are the strengths that make this applicant able to perform this job?
>
> The applicant's strengths are his overall knowledge of the job duties, responsibilities and functions conducted within the Investigations section. He has great inter-personal skills and the ability to resolve issues that arise with a satisfactory outcome.
>
> 3) Why do you feel this applicant is the best suited for this position?
>
> This applicant is the best suited applicant for this position because of his long time experience in the section and his involvement in conducting every job duty that falls within the section's responsibilities. The applicant started his career in this section and has been part of the transition of where the section is today. The applicant possesses a great amount of knowledge about the section's needs and overall functions within the Law Enforcement Division and how important a role this section plays in the overall view of the agency. The applicant is well qualified for the position based on his educational background, continued Law Enforcement Training and his long time dedication to SCDNR.

ECF No. 46-3 at 30.

In deposition, Sullivan has further described his reasons for choosing Pritcher. Sullivan began his career as a marine theft investigator with DNR's predecessor agency in 1984 and worked much of his career as an investigator. Sullivan Dep. 8-30, 132-33. Sullivan and Pritcher began working together as investigators when Pritcher transferred to the Investigations Section in 1999. *Id.* at 75. In 2005, Sullivan, Pritcher, and other then-investigators competed for the previous L-I position—a position for which Sullivan was chosen. *Id.* at 21-22. At that time the Investigations

Section was comprised of three investigators: Sullivan and Pritcher and one other. *Id.* at 27. During his tenure as L-I, Sullivan hired three additional investigators, including Plaintiff; he supervised those investigators as well as an officer in the marine-theft office. *Id.* at 29-30.

At the time he chose Plaintiff as an investigator, Sullivan also interviewed several males.[7] Sullivan Dep. 102, 133. Sullivan recalls having met Plaintiff when she began as a field officer, and Plaintiff was working in the Education Section when Sullivan began in the Investigations Section in 1999. Sullivan Dep. 85. In December 2011, four other officers were transferred to the Investigations Section and were under Sullivan's supervision. Sullivan Dep. at 25. It was then that Sullivan's position was reclassified to that of captain. *Id.* at 23-24. Sullivan is still a captain and reports directly to Colonel Frampton and Executive Director Taylor. *Id.* at 24.

As noted above, it was after Sullivan became a captain that it was determined that the L-I position at issue would be reinstated. Sullivan drafted a position description, which was approved and posted. After the application period ended, Sullivan obtained the applicants' submissions from HR, assembled an interview panel, and scheduled interviews. Sullivan Dep. 38, 46-47.

Going into the interviews, Sullivan expected there were three applicants who were "fairly close in some qualifications": Plaintiff, Pritcher, and Tony Spires. Sullivan Dep. 67. Sullivan "felt like [those three] were pretty close based on their time in the department." He had not reviewed their training, credentials, and accomplishments at that time. *Id.* at 80. Sullivan's determination of who should get the job would be based on the candidates' credentials, their interviews, and his experience supervising them. *Id.* at 81.

Sullivan indicated Plaintiff was not as confident or direct in her answers during the interview for the L-I position as he recalled her having been during the interview for the

---

[7] Sullivan recalled two male candidates by name; Plaintiff recalled those same male candidates and one other by name. Plaintiff recalled there were "six or seven" candidates for the 2007 investigator position. Pl.'s Dep. 10.

investigator's job in 2007. Sullivan Dep. 102. He "didn't think she had a good interview" for the L-I job, noting she began answering many questions based on her own experience as an investigator rather than her hypothetical thoughts about how things should be handled as a supervisor. *Id.*

Sullivan testified Plaintiff's strengths included her organization, attention to detail, and knowledge of the law. *Id.* at 103. Sullivan also noted Plaintiff was dedicated and passionate. *Id.* When asked about what he believed Plaintiff lacked for a supervisory role, Sullivan testified he believed Plaintiff "lacked some of the confidence needed to make a decision as a supervisor[.]" *Id.* at 104.

When asked about his interview of Pritcher, Sullivan testified Pritcher was "very confident" in his answers, gave answers that were "spot on" what Sullivan anticipated the answers should be, and he gave detail-oriented answers. Sullivan Dep. at 111-12.

Sullivan circled the numerical scores on the interview sheets after each candidate left the room. Sullivan Dep. 112-13. He did not compare numerical scores with Sabaka or Welch. *Id.* At the interviews' conclusion, Sullivan considered the candidates, what he knew from supervising them, and the things they had done as employees, and Sullivan felt Pritcher and Plaintiff were "steps above" the other candidates. *Id.* at 104. Sullivan "just really didn't think [Plaintiff] was quite ready." *Id.*

2.  Mike Sabaka

Sabaka, now a Staff Operations Captain, began working with DNR's predecessor agency in 1987 as a covert officer. He later served as a DNR Investigator until promoted out of the Investigations Section in 2005. Sabaka Dep. 8-13. Sabaka has known Plaintiff and Pritcher since their early years with DNR, and he has worked with them both. *Id.* at 15-20, 37-39.

In October 2012 Sullivan asked Sabaka to sit on the L-I selection Panel, and Sabaka agreed to do so because of his "passion for the job, [his] previous experience, and because [he] felt strongly

about the investigations program." Sabaka Dep. 49-50. During that discussion Sabaka asked Sullivan who the candidates were, but he does not recall having other discussions about the candidates before the interviews took place. *Id.* at 52, 55.

Sabaka has always known Plaintiff to be an "[e]xtremely capable investigator" with a good personality for interacting with the public and a good knowledge of applicable laws. Sabaka Dep. 40-45. He did not have first-hand knowledge of Plaintiff's planning and organizational skills. *Id.* at 45.

Sabaka describes Pritcher as a good investigator and multi-tasker. Sabaka Dep. 24-25. During the time Sabaka and Pritcher performed the same investigative job in different territories, Sabaka never had reasons to doubt Pritcher was a proficient investigator. *Id.* Because Pritcher lived in Charleston near the main office for marine investigations, Sabaka knew Pritcher had additional duties that other investigators did not have. *Id.*

In Sabaka's opinion of the interview process, the two candidates at the top were Pritcher and Plaintiff. Sabaka Dep. 64, 70. Sabaka noted that the interview, grading, and hiring process was a subjective one, even when using scoring sheets. *Id.* at 58, 75-76. Sabaka's experience with the candidates probably factored into how he rated them. *Id.* at 64-65.

Several things stood out to Sabaka that distinguished Pritcher from Plaintiff in the interview process. Sabaka Dep. 70-73. Pritcher was the only candidate who had, at some point in his career, worked in every capacity that the L-I would be supervising. *Id.* at 70. Another distinction was that Pritcher's responses to interview questions were more management-oriented than Plaintiff's. *Id.* at 70-71. Pritcher's responses included more than discussions of tasks that would be performed. Rather, he addressed things from a managerial perspective. *Id.* In particular, Sabaka recalls Pritcher's response to a hypothetical question concerning a reported multiple-fatality incident on a lake. All other candidates stated the first thing they would do was deploy resources, but Pritcher

stated he would first contact the on-scene officer. To Sabaka, this demonstrated a thoughtful approach to utilization of limited resources. *Id.* at 71-72. In response to that same hypothetical question, Sabaka had noted Plaintiff's response included skipping up the chain of command and directly contacting the Colonel, rather than first contacting her direct supervisor, Sullivan. *Id.* at 98-101.

Although he does not recall the particulars, Sabaka is sure he discussed the candidates with the others on the Panel after they had all completed their scoring sheets. Sabaka Dep. 103-04. Sabaka considered what the candidates said, and whether they hit the key components the interviewers believed to be important. In the end, "based on [his] observation," Sabaka "made [] a call on who [he] felt was the best candidate based on the answers and based on [his] scoring." *Id.* at 75-76. In his notes taken concerning Pritcher's interview, Sabaka indicated that Pritcher was the only applicant who had discussed management issues, the use of technology, and the use of existing personnel in different capacities. ECF No. 46-2 at 52. Ultimately, Sabaka felt Pritcher's experience was reflected in his expressions of knowledge of the job, planning, organizing, and supervision, and rendered Pritcher's ratings higher than Camlin's in several respects. Sabaka Dep. 91-101.

3. Stephanie Welch

Stephanie Welch, the HR manager on the Panel, had limited personal knowledge of Pritcher's work and no personal knowledge of Plaintiff's work. Welch had met Plaintiff and knew by reputation that she always did good work. Welch Dep. 38-39, 46-47, ECF No. 46-6. Welch testified that, by the time the Panel interviewed Plaintiff, they had already interviewed four other candidates, giving her some basis of comparison for Plaintiff and for Pitcher, who was interviewed last. *Id.* at 56-57. Welch recalled Plaintiff as having had a good interview, but noted Plaintiff was a bit long-winded in some responses and emphasized the training guide for marine law enforcement school a lot. *Id.* at 49-50.

Welch graded based on the candidates' responses to questions and the quality of their explanations of their answers. *Id.* at 52, 58-60. For example, Welch rated Pritcher "6" in the critical job requirement of Planning, while rating Plaintiff "4," because Plaintiff could have given more information in some of her answers, while Pritcher gave more specifics as to what needed to be done and how to improve things. *Id.* at 63, 91-93. Welch rated Pritcher "6" in the critical job requirement of Job Knowledge/Responsibilities, and Plaintiff "5," based on Pritcher's greater number of years in the Investigations Section and his level of experience and knowledge of the functions of the Investigations Section. *Id.* at 93-97. Welch testified she gave Pritcher a "6" and Plaintiff a "5" in "Organization" based on Pritcher's giving more detailed responses to questions. *Id.* at 97.

Welch recalls that, at the time of the interviews, Plaintiff had been an investigator for five or six years and had been involved with the marine law enforcement school. Welch Dep. at 85. Welch testified the biggest difference that separated Pritcher from Plaintiff was that Pritcher had "more experience in the investigative section in the field[,] with about 15 years in the Investigations Section." *Id.* In addition, based on their responses, Welch believed Pritcher had more passion for the L-I position. *Id.* at 87.

G.  Promotion decision

Sullivan contacted all candidates by telephone on the morning of October 30, 2012, and told them of the decision to promote Pritcher to the L-I position. Def.'s Resps. to Pl.'s Interrogs., ECF No. 50-13 at 6. Plaintiff's telephone conversation with Sullivan at that time was short, and they did not discuss the reasons for Pritcher's selection or for Plaintiff's nonselection. Pl.'s Dep. 76-77.

H.  Charge of discrimination and litigation

Plaintiff filed a Charge of Discrimination with SHAC on January 29, 2013, alleging she was discriminated against based on her sex in violation of SHAC law and Title VII. Plaintiff indicates

she was denied a promotion on October 30, 2012, given no reason for the denial, and the position was filled by a "less qualified male." ECF No. 46-2 at 4. A right-to-sue letter was issued to Plaintiff, and she filed this litigation in the Court of Common Pleas for Horry County. Defendant removed the matter to this court on August 21, 2014. ECF No. 1.

II.     Standard of review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the nonmoving party is to be believed and all justifiable inferences must be drawn in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment

motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact). In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the nonmoving party's favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002) (Title VII). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000).

III.    Analysis

    A.  Failure to promote: applicable legal principles

    Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may demonstrate a violation of Title VII through direct or circumstantial evidence. When direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Both Plaintiff and Defendant analyze Plaintiff's failure-to-promote claim under the burden-shifting framework. A plaintiff bringing a failure to promote claim for disparate treatment[8] must demonstrate: (1) she is a

_____

[8] Based on various statistical and anecdotal evidence Plaintiff submits in opposition to summary judgment, Defendant argues in reply that Plaintiff has impermissibly added a disparate-*impact*/pattern-and-practice claim to her suit. *See* Reply 4-7. To the extent Plaintiff is attempting to

member of a protected group; (2) she applied for the position in question; (3) she was qualified for that position; and (4) the defendant rejected her application under circumstances that give rise to an inference of unlawful discrimination. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005).

Here, Defendant does not focus on the prima facie case, noting this is a "relatively simple showing" for Plaintiff. Def.'s Mem. 18. Rather, Defendant assumes without discussing that the prima facie case has been met, and argues it is entitled to summary judgment because it has produced evidence of a legitimate, nondiscriminatory reason for its employment action, and Plaintiff cannot satisfy her burden of demonstrating by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Plaintiff, too, frames the sole issue before the court as "whether DNR's reason for denying [Plaintiff] the promotion—that she was less qualified than Mr. Pritcher—may be reasonably seen by a trier of fact as pretextual." Pl.'s Mem. 28. Plaintiff has the burden of establishing pretext in this posture. *Burdine*, 450 U.S. at 253. "'A plaintiff alleging a failure to promote can prove pretext by showing that he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons.'" *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 559 (4th Cir. 2011) (quoting *Heiko v. Colombo Sav. Bank,* 434

---

add a disparate-impact claim at this late date, the undersigned agrees with Defendant that this addition would be improper at this juncture. *See, e.g., Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005) (the scope of a charge of discrimination "plays a substantial role in focusing the formal litigation it precedes."). However, the undersigned does not understand Plaintiff's presentation of statistical and anecdotal evidence to be raising a new claim; rather, Plaintiff seems to provide the evidence as support of her disparate-*treatment* claim. *See Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 760-61 (4th Cir. 1998) *cert. granted, judgment vacated on other grounds*, 527 U.S. 1031 (1999) (noting "[e]vidence of a pattern or practice of discrimination" may be useful as part of a claimant's disparate-treatment claim—either as part of the prima facie case, to demonstrate pretext, or to establish plaintiff's ultimate burden). The competence and relevance of Plaintiff's statistical and anecdotal evidence are discussed below in the context of Plaintiff's disparate-*treatment* claim.

F.3d 249, 259 (4th Cir. 2006)). In satisfying that burden, the nonmovant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1316 (4th Cir. 1993).

The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. *See Reeves,* 530 U.S. at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory"). Further, "[d]uty-bound though we are to examine employment decisions for unlawful discrimination, we are not cloaked with the authority to strip employers of their basic business responsibilities." *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006) (in failure-to-promote context); *see also DeJarnette v. Corning Inc.*, 133 F.3d 293, 298-99 (4th Cir. 1998) (noting that when reviewing employer's articulated reasons for employment decision, the court "must keep in mind that Title VII is not a vehicle for substituting the judgment of a court for that of the employer," and the court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." (internal quotations and citations omitted)).

B.  DNR's proffered reasons for promoting Pritcher, not Plaintiff

Plaintiff does not dispute that Defendant has set out nondiscriminatory business reasons for its promotion decision; rather Plaintiff submits these reasons were not the real reasons, but were pretextual. A brief list of Defendant's proffered legitimate, nondiscriminatory reasons is necessary for consideration of Plaintiff's pretext argument. *See Adams*, 640 F.2d at 559 (to show pretext, an employee can show she was better qualified or provide circumstantial evidence otherwise undermining credibility of employer's stated reasons). For example,

17

- In the four core job competencies (job knowledge/responsibilities, planning, organizing, and supervisory and leadership potential) identified by management, the three interview Panel members unanimously scored Pritcher higher than Plaintiff: aggregate scores of 22, 23, and 22 for Pritcher; scores of 18, 19, and 18 for Plaintiff. Pritcher's total score of 67 was higher than Plaintiff's 55 score.

- With 15 years in the Investigations Section, Pritcher's experience in the Section the L-I would be supervising was significantly higher than Plaintiff's 5 years in that Section.

- While both candidates had significant LE experience, Pritcher had 26 years as compared to Plaintiff's 22 years. *See* Def.'s Mem. 20.

- Sullivan submitted a "Justification Summary Sheet" to HR, in which he indicated, *inter alia*, that Pritcher had the most detailed knowledge of relevant duties, the longest tenure in the Investigations Department, and had conducted every job duty that falls within the Section's responsibilities. ECF No. 46-3 at 30.

- Sullivan, who would be the direct supervisor of the successful candidate, stated his recommendation would be based on the applicants' credentials, their interviews, and his experience supervising them. Sullivan Dep. 81. Sullivan found Plaintiff's responses in her interview indicated a lack of confidence—a skill needed as a supervisor. *Id.* at 103-04. On the other hand, Sullivan felt Pritcher was confident in his interview responses and gave the responses Sullivan was looking for from the candidates. *Id.* at 111-12.

- Panel member Sabaka found Pritcher's interview responses to be much more management-oriented than those of other applicants. Sabaka Dep. 70-71.

- Panel member Welch gave Pritcher higher scores in Planning because Pritcher offered specifics of what he believed would need to be done in various areas; Plaintiff's responses were more rambling and lacked detail. Welch Dep. 63, 91-93.

Unquestionably, Defendant has set out legitimate, nondiscriminatory reasons for choosing Pritcher over Plaintiff for the L-I position. The court must now consider whether Plaintiff has satisfied her burden of demonstrating pretext.

C. Plaintiff's pretext argument

In support of her pretext argument, Plaintiff seeks to undermine the credibility of Defendant's proffered, nondiscriminatory reasons for the promotion decision by offering evidence she casts into several categories: 1) evidence Plaintiff was more qualified than Pritcher; 2) evidence of DNR's historically discriminatory hiring practices and "boys' club" atmosphere; 3) evidence that

Pritcher was being steered toward the position prior to its posting; and 4) evidence the "cards were stacked" against Plaintiff even before her interview because the Panel's composition violated DNR policy and was composed entirely of individuals with significant professional and personal relationships with Pritcher. *See* Pl.'s Mem. 28 (listing these categories of evidence). To the extent practicable, the undersigned considers Plaintiff's argument in the context of these four categories.

1.  Qualification evidence

One of the ways Plaintiff can demonstrate pretext is to show she was better qualified than Pritcher. *Adams*, 640 F.3d at 559. Assessment of relative qualifications is to be based on criteria the employer has established as relevant to the position in question. *Heiko v. Colombo Savings Bank, F.S.B.,* 434 F.3d 249, 259 (4th Cir. 2006). As the Fourth Circuit has instructed,

> When a plaintiff asserts job qualifications that are similar or only slightly superior to those of the person eventually selected, the promotion decision remains vested in the sound business judgment of the employer. But where [] the plaintiff has made a strong showing that his qualifications are demonstrably superior, he has provided sufficient evidence that the employer's explanation may be pretext for discrimination.

*Id.* at 261–62 (internal citations omitted).

a.  Factors considered

As part of Plaintiff's pretext argument that she is better qualified than Pritcher, Plaintiff focuses on the "minimum requirements" and "additional comments" set out in the job posting. *See* Pl.'s Mem. 29-30 (noting the posting's requirements of five years as a DNR LE Officer, a thorough understanding of state and federal laws applicable to Investigations and to law enforcement, familiarity with the legislative process, and ability to focus and possession of strong management and leadership skills). Plaintiff submits that these qualifications require focus on "a comparison of the candidates' respective training, credentials, and accomplishments." *Id.* at 30. The gist of this portion of Plaintiff's argument seems to be that the Panel's consideration of other factors— particularly years of experience in the Investigations Section—was improper. *Id.* at 29-30.

19

Plaintiff looks to isolated excerpts of Sullivan's deposition testimony in trying to demonstrate that only those qualifications mentioned in the job posting should be considered in determining relative qualifications. "According to Sullivan, who authored the job description, selected the Panel, and asked all of the interview questions, neither experience nor tenure were [sic] relevant to his decision to promote Mr. Pritcher in lieu of [Plaintiff]." Pl.'s Mem. 29 (citing Sullivan Dep. 79-80, 82). Plaintiff continues by citing Sullivan's testimony that "no one candidate was more qualified than the other," and that he had no preferred candidate in mind, but that he believed Plaintiff, Pritcher, and another candidate were "pretty close" based on their time in the department. *Id.* (citing Sullivan Dep. 80, 82).

Plaintiff also submits years of experience did not factor in the decision based on Sullivan's testimony that he considered "[o]verall job knowledge, overall section knowledge, overall ability to do those jobs and know how they're done, experience as an investigator, experience as a DNR officer, which I look at as really one and the same." Sullivan Dep. 90-91. Accordingly, Plaintiff submits that Sullivan indicated he would consider the candidates' "training, credentials, and things that they had done and completed," and that the candidates' respective years of experience would be "irrelevant." Pl.'s Mem. 30. Plaintiff also argues Sullivan's focus on the candidates' relative confidence levels was improperly subjective and could be found to be "paternalistic in nature." Pl.'s Mem. 32.

Although Plaintiff may attempt to establish pretext by demonstrating superior qualifications and by undermining the reasons given by Defendant for selecting Pritcher, her arguments fall short here. As an initial matter, Plaintiff has taken select words and phrases from Sullivan's deposition in an attempt to undermine Defendant's stated reasons for promoting Pritcher. While Plaintiff never misquotes Sullivan's deposition, a fair reading of the excerpts on which Plaintiff relies does *not* suggest to the court that Sullivan meant he did not intend to even consider years of experience,

20

confidence, or managerial skill. As noted in *Anderson*, Plaintiff "cannot establish her own criteria for judging her qualifications for the promotion. She must compete for the promotion based on the qualifications established by" her employer. 406 F.3d at 269 (citing *Beall v. Abbott Labs.*, 130 F.3d 614, 620 (1997) ("[A]bsent evidence of [discriminatory] motive, we leave to the employer's discretion the method of evaluating an employee's job performance."). Certainly it follows that Plaintiff cannot cobble together snippets of testimony from management to support her version of the appropriate considerations.

Further, Plaintiff's argument that only those job requirements and considerations set out in the job *posting* were important in choosing the successful candidate is without merit. The posting lists several "minimum" requirements, and none of Plaintiff's evidence or argument would permit a reasonable juror to find the competencies scored by the interviewers or the questions[9] asked in the interviews were not appropriately considered job qualifications. To the extent Plaintiff is arguing Defendant's indication that relative experience was an "ex post facto" reason dreamed up by the Panel members, no testimony snippet or argument by Plaintiff convinces the undersigned that a factfinder would ever consider it improper to examine candidates' relative years of experience in making hiring decisions. Further, in documents authored just after the interviews, Sullivan noted Pritcher's "long tenure" in the Investigations Section, and noted the fact that Pritcher had performed all duties covered by the Section made him the recommended candidate. ECF No. 46-3 at 28, *see also id.* at 29-30.

In considering this argument, the court is guided by the Fourth Circuit's instruction that, when two candidates have similar qualifications or one is only "slightly superior," the promotion decision "remains vested in the sound business judgment of the employer." *Hux*, 451 F.3d at 261

---

[9] Plaintiff does not appear to argue that the interview questions themselves were biased or intended to permit Defendant to promote a male over a female. In any event, the undersigned finds the questions Sullivan crafted and asked the candidates were appropriately framed and add nothing to Plaintiff's pretext theory.

(citing *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 649 & n.4 (4th Cir. 2002)). Only when a plaintiff makes a "strong showing that [her] qualifications are demonstrably superior," has he provided evidence of possible pretext. *Heiko*, 434 F.3d at 261-62. Here, the undersigned is of the opinion that Plaintiff has not demonstrated her qualifications were "far superior" to Pritcher's. Plaintiff's arguments supporting her claimed superior qualifications do no more than offer her and her counsel's focus on various factors she (and others) believe made her more qualified. *See, e.g.*, Pl.'s Mem. 31 (chart of accomplishments listed in written materials provided to the Panel). *See Anderson*, 406 F.3d at 269.

Certainly, DNR appropriately considered the candidates' relative training and expertise in making the promotion decision. *See, e.g.*, Sullivan Dep. 81 (noting he would choose the successful candidate based on their credentials, their interview responses, and his experience supervising them). Further, the interviewers and decision makers were aware of the materials submitted and asked interview questions that permitted the candidates to provide insight into their experience and knowledge in relevant substantive areas. For example, "Question 2" of the interview questions asked the candidate to "[e]xplain to the panel a little about each program or investigative function in the Investigative Section," and included a list of the responses the interviewers expected to receive. *See, e.g.*, ECF No. 46-2 at 37 and 41 (Sullivan's notes regarding Pritcher's responses) and at 55 and 59 (Sullivan's notes regarding Plaintiff's responses). Sullivan's scores of the "Job Knowledge/Responsibilities" core competency, which were based in part on the candidates' responses to interview Question 2, was a "5" for Pritcher and a "4" for Plaintiff. These notes and scores—written contemporaneously with or just after the interviews—reflects the principal decision maker's thoughts as to the best candidate. That Plaintiff can now come up with a longer list of honors and the like does not come close to suggesting pretext.

Further, Plaintiff's focus on specific factors (such as a longer list of "Honors/Awards/Achievements" listed in her candidate submission packet) does what the law does not permit—give more weight to isolated factors rather than the multiple factors considered in combination. *Cf. Hux*, 451 F.3d at 311 (plaintiff "cannot simply compare herself to other employees on the basis of a single evaluative factor artificially severed from the employer's focus on multiple factors in combination."). For the court to find otherwise would have it impermissibly acting as a "super-personnel department." Plaintiff's opinions, and those of people who were not decision makers, are irrelevant. *See Hux*, 451 F.3d at 318 (noting it is the perception of the decision maker that is relevant).

For these same reasons, Plaintiff's argument that she has more years of *law-enforcement* experience than Pritcher does not establish pretext. Plaintiff provides her own chart of the relative number of years she and Pritcher spent in "Law Enforcement," in which she concludes she has 13 years of such experience as compared to Pritcher's 12 years. Pl.'s Mem. 13. Compare with Defendant's noting that Pritcher had 26 years of LE experience and Plaintiff had 22 years. *See* Def.'s Mem. 20. To arrive at her LE-experience figures, Plaintiff categorizes 3 of Pritcher's 26 total years with DNR as having spent the majority of his time on "aids to navigation," which she describes as "placing buoys in water." Plaintiff submits that those three years do not count as "LE experience" for Pritcher. *Id.* at 13, 35. As an initial matter, Plaintiff's for-litigation characterization of how Pritcher spent the majority of his time is of questionable (if any) evidentiary value. Even considering this accounting, it does not bolster Plaintiff's pretext argument. Again, at best, she is offering her own take on criteria she believes the decision-maker should have considered. This she cannot do. *See Hux*, 451 F.3d at 311. In addition DNR has explained that the number of years Pritcher and she had spent in the Investigations Section—the Section the L-I would supervise—was the relevant experience metric that impacted their decisions. *See, e.g.*, ECF No. 46-3 at 29-30

23

(Sullivan's notation that Pritcher is the best candidate based in part on "his long time experience in the [Investigations] section"); Sabaka Dep. 71-72; Welch Dep. 95.

      b.  Non-decision-makers' opinions of relative qualifications

Plaintiff has also proffered the affidavits of eight current and former DNR employees in support of her pretext argument. As an initial matter, the undersigned notes Defendant's objection to the consideration of these affidavits as none of the affiants was named as witnesses during the discovery period. Def.'s Reply 10 n.4. While this argument may have some validity, Defendant offers no legal authority to support it. Out of an abundance of caution, then, the court has reviewed these affidavits for what they may be worth. To the extent the affidavit testimony is considered at all, it does not provide relevant information to further Plaintiff's pretext argument.

For example,[10] testimony from field officer Benny Owens that Plaintiff is "top-notch," organized, and credible, ECF No. 50-30, and similar testimony from DNR Lt. Kim Leverich that Plaintiff is "among the very best" DNR LE Officers and an "outstanding officer and leader," ECF No. 50-37, is not helpful to Plaintiff because neither Owens nor Leverich was a decision maker in filling the L-I position. *See also* Affidavit of DNR employee Kristie Lumley ("Lumley Aff."), ECF No. 50-10 (indicating she had worked with Plaintiff and Pritcher and that Plaintiff was the most qualified for the 2012 L-I position); Affidavit of former DNR employee Willam H. Duncan V ("Duncan Aff."), ECF No. 50-35 (offering observations from his 1990-to-2002 tenure); Affidavit of DNR Investigator Ray Lewis ("Lewis Aff."), ECF No. 50-36 (offering observations of Pritcher and Plaintiff from experience in Marine Law Enforcement School); Affidavit of DNR retiree Scott Powell ("Powell Aff."), ECF No. 50-31 (opining Plaintiff is "one of the best female officers in the state of South Carolina.").

---

[10] This discussion of the proffered affidavit testimony is not intended to provide all of the details of each of these affidavits. Although not set out in full in this Report, and without ruling on their admissibility, the undersigned has reviewed all affidavits submitted and is unpersuaded that Plaintiff has established pretext.

None of these 11th-hour witnesses/affiants presented was on the Panel considering the 2012 L-I promotion, and Plaintiff has not proffered any evidence that any of them acted as a decision maker in this promotion decision in any way.[11] Accordingly, their testimony concerning Plaintiff's and Pritcher's relative performance as DNR employees is not relevant in considering pretext. *Hux*, 451 F.3d at 318 (noting it is the perception of the decision maker that is relevant).

Other arguments Plaintiff offers regarding her superior skills in certain areas such as organization are from non-decision makers involving specific matters or those employees' general opinions of relative merit. This attempt to refocus the considerations of the Panel cannot successfully demonstrate pretext. Plaintiff's aggregation of evidence and arguments attempting to demonstrate pretext based on her allegedly superior qualifications or in attacking Defendant's stated reasons and the scores given by the Panel members is not sufficient to permit a jury to infer pretext.

Plaintiff also argues her evidence demonstrates pretext by showing the Panel's scoring criteria was "arbitrary and subjective." (Pl.'s Mem. 38) (citing *Ham v. Washington Suburban Sanitary Comm'n*, 158 F. App'x. 457, 466 (4th Cir. 2005)). Plaintiff seems to base this argument on her having demonstrated that Sullivan was not considering experience in his decision and that the Panel's stated considerations were untrue. Plaintiff then focuses on Sullivan's consideration of Plaintiff's lack of confidence, suggesting this amounts to a decision maker's "preoccupation with subjective, tangential qualities" and those not pertinent to the position. *Id.*

As noted above, the undersigned is of the opinion Plaintiff has not demonstrated experience was not to be considered or that the stated considerations and scores of the Panel were untrue so as to show pretext. In addition, *Ham* does not support Plaintiff's argument. Sullivan's finding Plaintiff

---

[11] In making this recommendation, the undersigned is mindful that many of the colleagues' affidavits presented include accolades to Plaintiff for her deep knowledge of boating law and her work on the curriculum for Marine Law Enforcement School. While such expertise and work is commendable, focus on these specific knowledge areas does not demonstrate pretext. Again, the decision makers looked at numerous factors in making their promotion decision, and a myopic focus on one or a few of those factors is inappropriate when considering pretext.

lacking in confidence is in no way "tangential" to the L-I position. Sullivan tied a lack of confidence to potential managerial abilities. *See* Sullivan Dep. 104 (noting Plaintiff "lacked some of the confidence needed to make a decision as a supervisor"). *Cf. Ham*, 158 F. App'x at 466-67 (finding pretext when candidate who would be required to learn many new skills was chosen for a "Lead Tech" promotion over the plaintiff, who had been the Acting Lead Tech for three years, and noting focus on writing skills was tangential to the position and further evidence of pretext). Here, managerial ability is unquestionably a necessary requirement of a supervisory lieutenant position. Further, that Sabaka testified that the scoring was a "subjective process" is probative of nothing. To some extent, interviews will always involve some amount of subjective considerations. That is far different from the impermissible "preoccupation with subjective, tangential qualities" against which *Ham* warns. Again, Plaintiff has not demonstrated pretext.

      2.   Other evidence of pretext

Plaintiff also proffers various statistics related to the number of females employed by and promoted by DNR in LE positions, arguing these numbers "do not lie" and that they provide evidence of pretext in that they show that "DNR has historically favored the hiring and promotion of men rather than women." Pl.'s Mem. 39. She also submits affidavits of current and former DNR employees concerning an alleged "boys' club" mentality at DNR.

      a.   Statistical Evidence

Defendant objects to Plaintiff's possible statistical evidence to the extent it suggests Plaintiff is now adding a disparate-impact discrimination claim to its suit. The undersigned agrees Plaintiff should not be permitted to add an additional claim at this late date. However, the undersigned does not read Plaintiff's argument that way. Rather, it seems that Plaintiff offers the information as further evidence in support of her disparate-treatment claim.

As an example, one of the charts summarizing some of Plaintiff's proffered statistics follows:

Gender of Employees in DNR's Law Enforcement Division

|  | Females | Males | Total Employees | % of Female Employees |
|---|---|---|---|---|
| October 24, 2012 | 34 | 196 | 230 | 14.78% |
| August 25, 2015 | 33 | 264 | 297 | 11% |

Pl.'s Mem. 8 and 39. *See also* Pl.'s Mem. 9 for additional charts. Plaintiff's argument based on the numbers in the above chart is that, between 2012 and 2015, although DNR increased the number of total LE officers by 67, the number of female LE officers decreased by one. Plaintiff also cites to evidence that, up to the time of the L-I promotion at issue, DNR had only promoted one female to a lieutenant position. Although not easy to follow, Plaintiff attempts to provide some context for this information by providing evidence of the number of females who applied for positions between October 2012 and August 2015. *See* Pl.'s Mem. 6-9. In support of the "statistics" offered, Plaintiff generally cites to numbers contained in discovery responses provided by DNR in this litigation and affidavits of current and former employees to anecdotally recall numbers of females promoted and similar information. *See generally* Pl.'s Mem. 5-9 and exs. referenced therein.

As an initial matter, the undersigned shares Defendant's concern about the validity of considering statistics that have not been provided from or considered by an expert, but seem to have simply been compiled by Plaintiff's counsel for purposes of this argument. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 455 n.1 (4th Cir. 1989) (noting trial judge did not err in excluding statistical evidence that had been proffered without expert testimony as to how they were compiled or how they related to the claims); *E.E.O.C. v. Western Elec. Co., Inc.*, 713 F.2d 1011, 1018 (4th Cir. 1983) (cautioning courts to give "close scrutiny" to statistics).

Even if considered at all, the proffered information lacks the necessary comparative data to make the statistics potentially helpful or probative of Plaintiff's pretext argument. Statistics or similar evidence of a "pattern or practice of discrimination may very be useful and relevant to prove the fourth element of a prima facie case . . . or that the employer's articulated reasons for the adverse action was merely pretext, or to establish the plaintiff's ultimate burden." *Lowery,* 158 F.3d at 761 (internal citations omitted). Here, though, the undersigned agrees with Defendant that the statistics proffered by Plaintiff are problematic because they lack meaning and provide no competent evidence of a statistical disparity. Def.'s Reply. 6.

As the Fourth Circuit has explained, statistical evidence may not be useful where it has "little or no probative value." *Carter v. Ball,* 33 F.3d 450, 456 (4th Cir. 1994) (quoting *McDonnell Douglas,* 411 U.S. at 804–05)). For a claim based on discriminatory promotion, "the relevant comparison is between the percentage of minority employees and the percentage of potential minority applicants in the qualified labor pool." *Id.* Here, Plaintiff has provided no information about the qualifications of the unsuccessful female applicants she generally references in her charts, nor does she provide meaningful comparisons of DNR's workforce to the qualified applicant pool in the relevant job market. Further, as pointed out by Defendant in McGee's Reply Affidavit, among the missing information is information about similar statistics concerning male applicants for law enforcement promotions. McGee Reply Aff. ¶ 14, ECF No. 64-2. Without the needed foundation and underlying information required to make valid comparisons, the statistics provided by Plaintiff do not bolster her pretext argument.

Similarly, information about the number of DNR females who have been promoted to ranks of lieutenant or higher, without appropriate comparison points in the relevant labor market, does not demonstrate pretext. In addition to these numbers and counsel-provided statistical interpretation, Plaintiff cites both to DNR discovery responses and to the affidavit of Karen Swink for the

proposition that, from 2006 until 2014, seven females had applied for a lieutenant position within DNR's LE Section, but only two of those seven had been promoted. Pl.'s Mem. 8. In her affidavit, Swink notes that she was offered a promotion to lieutenant in 2009, but turned it down because DNR would not negotiate salary. *See* ECF No. 50-14. This caveat, which Plaintiff acknowledges by footnote, is an example of the unreliability of general statements of how *x* number of females were promoted. Without more information—such as appropriate comparative data and information as to promotions that may have been offered but not accepted—these raw numbers do not serve as appropriate evidence to show pretext. The undersigned is of the opinion that these numbers and testimony would not permit a reasonable juror to infer a general pattern of discrimination that might support a pretext argument. Summary judgment is appropriate.

b.    Anecdotal Evidence of a "Boys' Club"

In addition to the proffered statistical evidence, Plaintiff proffers the affidavits of several current and former DNR employees as evidence of DNR's history of hiring and promoting men— sometimes referred to in Plaintiff's argument as a "Boys' Club." Pl.'s Mem. 39-43. As noted above, the undersigned questions whether it is appropriate to consider these affidavits as they are from individuals who were not named as witnesses in this case. Again, out of an abundance of caution, the court has reviewed these proffered affidavits and does not find them to strengthen Plaintiff's pretext argument.

Plaintiff has proffered testimony of former general counsel Buford Mabry, who retired in 2013. Mabry Aff., ECF No. 50-9.[12] In addition to offering his personal opinion that Plaintiff was more qualified than Pritcher for the L-I position, Mabry offers his general "observation" that the

---

[12] In a footnote, DNR indicates "serious concern" with its former general counsel having provided an affidavit in this matter, and suggests such concern "will need to be dealt with." Def.'s Reply 10 n.4. DNR also raises questions about the competency of evidence in Mabry's Affidavit. *Id.* at 11 & nn.6-7. Even if considered at all, Mabry's Affidavit is of limited evidentiary value and does nothing to bolster Plaintiff's claims.

male supervisory chain of command was "not enthusiastic about hiring females," and that some unnamed individuals had "expressed the opinion that women could not do as good a job as men." *Id.* ¶ 3.

Plaintiff also points to the affidavit of former employee Duncan (male), in which Duncan indicates one of the reasons he left DNR in 2002 "was that there was a 'boys club' clique of men who made management decisions within SCDNR such as hiring and promotion." Duncan Aff. ¶ 6. Duncan continues, "If you were not in this 'boys club' you did not receive the same treatment in receiving promotions or career opportunities as those who were a part of the clique. It was my observation that individuals' careers were ruined for not being a part of this group." *Id.* Although he used the term "boys' club," what Duncan was actually describing was potential favoritism for those within a certain clique. While perhaps unfair to some, by Duncan's own statement, those outside of the clique, including males, were impacted. By definition, the situation Duncan described would not be evidence of actionable gender discrimination, as it does not describe a situation that even arguably impacted only those of a particular gender. *Cf. Anderson*, 406 F.3d at 271 (noting plaintiff's argument that another had been "preselected" did not provide sufficient evidence of pretext because, while potentially unfair, any "preselection" impacted all applicants regardless of their race); *DeJarnette,* 133 F.3d at 299 (noting the court is not to question whether an employment decision was "wise, fair, or even correct") (internal quotation and citation omitted).

Plaintiff also submits the affidavit of former DNR employee Powell, who testifies about other interview Panels on which he sat, including one that concerned a position in Region 4 for which Plaintiff had applied. Powell Aff. ¶ 7. According to Powell, when he commented favorably on Plaintiff's interview performance, another panel member told him it "ain't gonna happen." Powell attributes this to mean Plaintiff would not receive the promotion then at issue "because she had transferred out of Region 4 previously." *Id.* Powell also opines that panels would "consider

factors and/or qualifications in addition to what was listed on the written score sheets, including, but not limited to: years of experience an individual had, how well that individual got along with others, and how well that individually would potentially get along with others if promoted." *Id.* ¶ 9.

Plaintiff proffers the affidavit of First Sergeant Kristie Lumley, who indicated she had applied for lieutenant positions twice but had not been chosen either time. Lumley Aff., ECF No. 50-10. Lumley indicated she filed an EEOC charge when she was not chosen, but did not pursue the charge beyond the administrative phase. Lumley references the gender-make-up of other interview panels and indicated it was her "belief that SCDNR structured" panels considering some female candidates with more females than other panels "so that it would look less biased when they denied promotion to the female applicants." *Id.* ¶ 5. Lumley concludes her affidavit by indicating, "Based on my experience working for SCDNR, the female employees have to scratch and claw to get any positions as opposed to the clique of men who are promoted with lesser work ethic and/or qualifications." *Id.* ¶ 12.

Finally, Plaintiff offers the affidavit of DNR Lieutenant Karen Swink, who testified she had applied for and had been offered a lieutenant's position in 2009 but had chosen not to accept the position because DNR would not negotiate regarding salary. She did not have to interview for the lieutenant position she now holds. Swink Aff. ¶¶ 2, 3, ECF No. 50-14. Swink suggests that she was promoted to lieutenant as a result of EEOC charges having been filed by Lumley and by Plaintiff. *Id.* ¶ 12.

None of this testimony establishes pretext. For the most part, the testimony is far too general and speculative. For example, Lumley hypothesizes that additional females were placed on a particular interview panel so it would "look less biased" when a female was not hired. Lumley offers no basis for this statement. "Speculative assertions that a defendant's motivation was gender based is not enough to withstand summary judgment." *Guthrie v. Blue Ridge Sav. Bank*, 159 F.

31

Supp. 2d 903, 909 (W.D.N.C.), *aff'd sub nom. Guthrie v. Blue Ridge Sav. Bank, Inc.*, 215 F.3d 1318 (4th Cir. 2000) (citing *Goldberg v. B. Green and Co.,* 836 F.2d 845, 848 (4th Cir. 1988)).

Powell's surmise about what a member of another interview panel meant by stating something was not going to happen lacks sufficient evidentiary foundation and includes hearsay. The law does not permit a plaintiff to rely on hearsay to defeat a properly supported summary judgment motion. *See Md. Highways Contractors Ass'n v. State of Md.,* 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."). Mabry's recollection that unnamed individuals were unenthused about hiring females is similarly unhelpful.

While a "pattern or practice" of discriminatory behavior can be offered to show disparate treatment in a single-plaintiff matter, a plaintiff cannot demonstrate any sort of pattern or practice with speculations and suppositions regarding atmosphere or reasons for particular prior hiring decisions without providing sufficient basis for such information. Plaintiff has not provided any authority demonstrating the type of evidence she has provided can be used to show a pattern or practice in a single-plaintiff disparate treatment case. The undersigned's independent research regarding what type of evidence courts have permitted to establish a pattern or practice in this type of matter, provides little guidance. Several cases discussing such use of pattern-or-practice evidence to show pretext concern statistical evidence. *See, e.g., Carter* 33 F.3d at 456. As discussed above, the statistics Plaintiff has offered do not pass muster. Similarly, the evidence she has offered is not sufficiently specific or tied to Plaintiff's promotion decision. *Cf. Oliver v. Gleamns Human Res. Comm'n Inc.*, No. 8:10CV01191-JMC-KFM, 2011 WL 3159149, at *7 (D.S.C. May 31, 2011), *report and recommendation adopted,* No. 8:10-CV-01191-JMC, 2011 WL 3319739 (D.S.C. July 26, 2011), *aff'd,* 464 F. App'x 154 (4th Cir. 2012) (finding general statements about what happened with other promotions insufficient to support single-plaintiff's failure-to-promote claim).

As noted in *Calobrisi v. Booz Allen Hamilton, Inc.*, Civil Action No. 1:14-996 (AJT/MSN), 2015 WL 1349627 (E.D. Va. 2015), a failure-to-promote case cited by Defendant in reply:

> Typically, pattern and practice evidence consists of statistical proof of disparate impact within the work force, often accompanied by direct evidence of discriminatory animus on a class basis, such as statements by supervisors condoning discriminatory conduct. *See, e.g., Holsey v. Armour & Co.*, 743 F.2d 199, 214 (4th Cir. 1984). Some courts have also recognized that pattern and practice evidence may be used in a non-class action case to raise an inference of discrimination against a particular member of that class. *See, e.g. Gilyard v. Northlake Foods, Inc.*, 367 F. Supp. 2d 1008, 1015 (E.D. Va. 2005) (citing *Lowery, supra*). Some courts have also admitted anecdotal evidence of discriminatory animus generally where there is demonstrable link to the plaintiff and her treatment. *See, e.g., Robinson v. Runyon*, 149 F.3d 507, 514 (6th Cir. 1998) (plaintiff "has connected the bogus application directly to her own work area and to one of the managers involved in the case."); *Mendelsohn v. Sprint/United Mgmt. Co.*, 402 F.App'x 337, 340 (10th Cir. 2010) ("[T]he plaintiff must demonstrate a nexus between the allegedly discriminatory statements and the defendant's decision to terminate her. Anecdotal evidence of discrimination should only be admitted if the prior incidences of alleged discrimination can somehow be tied to the employment actions disputed in the case at hand." (internal citations omitted); *but see Sprint/United Managment Company v. Mendelsohn*, 552 U.S. 379, 380 (a court has "wide discretion" to exclude under Fed.R.[Evid.] 403 "testimony by nonparties alleging discrimination at the hands of supervisors of the defendant company who played no role in the adverse employment decision challenged by the plaintiff.")

2015 WL 1349627, at *7. In discussing what the *Calobrisi* parties called "me-too evidence," that is, evidence from women supposedly similarly situated to the plaintiff who experienced the purported "corporate culture" of discrimination against older women, the court found it lacking. In addition to noting none of the statistics proffered included sufficient contextual information to be considered, the court also looked to the "me-too" evidence provided by other employees:

> Rather than statistics, Plaintiff relies centrally on the subjective judgments of former employees who held a variety of jobs, at a variety of times between 2007 and 2014, under a variety of managers, in different aspects of the Booz Allen organization, none of whom were affected by anything pertaining to the restructuring or any decisions made with respect to that restructuring, including any decisions pertaining to the plaintiff. [] Of the seven testifying former employees, only two had a position arguably comparable to Plaintiff in the Law Department, both of which left Booz Allen more than 7 years ago. The third witness in the LD was an administrative assistant. The remaining witnesses were in different divisions of the company, with differing titles, supervisors, and circumstances of departure, and with limited, if any, direct knowledge of the alleged discriminatory actions at issue in this case. None

were supervised by Osborne, Meyers or Manya. For these reasons, Plaintiff's me-too evidence is not the kind of anecdotal evidence that establishes a sufficient connection to a particular plaintiff to warrant an inference of discrimination as to that particular plaintiff. *See, e.g., Spulak v. K Mart Corp*., 894 F.2d 1150 (10th Cir. 1990) and *Polanco v. City of Austin*, 78 F.3d 968 (5th Cir. 1996), where witnesses worked in the same positions and departments, or who could testify directly to the discriminatory behaviors of the plaintiff's supervisors.

*Id.* at *8-9 (footnote omitted).

Here, too, Plaintiff's proffered statements about culture and others having been denied promotion are too speculative and contain insufficient relationship to Plaintiff. *See id.* Plaintiff's affidavits offering anecdotal evidence of what others may have heard or may have experienced are not sufficiently connected to Plaintiff's 2012 failure-to-promote claim to provide any evidence of pretext.

### c. Evidence of any pre-posting advantage to Pritcher

Plaintiff also argues Defendant had "pre-determined" that Pritcher would receive the L-I position prior to the posting and notice of the position's creation and opening. Pl.'s Mem. 43-45. Plaintiff's evidence in support of this argument comes largely from her own deposition and is, at best, speculative in nature. For example, Plaintiff submits because Pritcher was selected to attend a management-training class in or around January 2012, Pritcher was given the opportunity to increase skills needed for the yet-to-be-posted position. Pl.'s Mem. 44. Plaintiff indicates she and "a list of individuals" had made their interest in attending that class known, but it was Pritcher who was selected. Plaintiff also mentions that Plaintiff sent his administrative assistant to a training course in August 2012 so that his assistant could learn how to do certain tasks Pritcher had been doing, and presumably, he would no longer be doing once he was promoted. *Id.* Finally, Plaintiff also references a comment she heard Colonel Frampton make to Pritcher in August 2012 relating to Pritcher's "want[ing] to lead people." Pl.'s Mem. 45. Plaintiff suggests this indicated Frampton already been told of Pritcher's interest in the upcoming L-I position. *Id.*

The undersigned questions whether any of these comments or observations could in any manner suggest Pritcher's "preselection" for the L-I position. Even if they could provide such a suggestion, the Fourth Circuit has plainly stated that "the argument that a supervisor may have preselected an employee for a promotion 'is not sufficient evidence for jurors reasonably to conclude' that the defendants' explanation for hiring [a certain individual] was prextext." *Anderson*, 406 F.3d at 271 (quoting *Mackey v. Shalala,* 360 F.3d 463, 468–69 (4th Cir. 2004)). As the *Anderson* court pointed out, having an employee preselected for promotion could potentially show "unfair treatment," but it could not show Title VII discrimination because "'the preselection would work to the detriment of all applicants for the job, black and white [or male and female] alike.'" *Id.* (*quoting Blue v. United States Dep't of the Army,* 914 F.2d 525, 541 (4th Cir. 1990)). Here, Plaintiff indicated there was a "list of individuals" who wanted to attend the management course, although she offered no particulars as to the gender of those on the list. Further, and most telling, Pritcher's competition for the L-I position included both males and females. Pritcher's alleged preselection negatively impacted all of the unsuccessful candidates.

Plaintiff's proffered preselection evidence does not bolster her pretext argument.

d.  Evidence concerning the Panel's composition and alleged bias

Finally, the court considers Plaintiff's argument that the reasons given for Pritcher's preselection were pretextual because the Panel Defendant chose did not follow DNR's internal guidelines, but was made up of DNR personnel who were "biased and/or unqualified" to sit on the Panel. *See* Pl.'s Mem. 46-49.

DNR's LE Division's Directive D348 provides that the interview Panel considering positions such as the L-I position at issue should be comprised of "the Captain, if appropriate 2) the appropriate Major, 3) the Lieutenant Colonel, and 4) a representative from the Office of Human Resources." ECF No. 46-2 at 28. Plaintiff submits it is evidence of pretext that the L-I Panel "on its

face" violated DNR policy. Pl.'s Mem. 46. Here, the Panel consisted of Sullivan ("the Captain"),

Sabaka (an Administration Captain with experience in the Investigations Section); and HR Manager

Welch. ECF No. 46-2 at 8. Defendant has explained that Captain Sabaka sat on the Panel because of

his relevant experience and because the Investigations Section did not have a major, and the LE

Division did not have a Lieutenant Colonel, as D348 had contemplated. Sullivan Dep. 51.

Plaintiff also submits that Sullivan created a biased Panel by structuring it to "include three

individuals who had significant prior history with Mr. Pritcher, more so than any other candidate."

Pl.'s Mem. 46, *see id.* at 46-47. Additionally, Plaintiff specifically questions Welch's Panel

membership, citing to Welch's deposition testimony that she was unfamiliar with the day-to-day

duties of an L-I.

This line of argument also falls short of showing pretext. Nothing in the argument or

proffered evidence suggests the Panel's composition was intended to invite gender discrimination.

DNR has provided cogent reasons for including Sabaka on the Panel in place of the "appropriate

Major" and "Lieutenant Colonel" called for in the Directive: an appropriate major or lieutenant

colonel did not exist at that time. As for the purported bias caused by having the Panel be comprised

by persons who knew Pritcher better than they knew Plaintiff, such arguments fail for the same

reason the "preselection" argument fails. Any potential "unfairness" in Pritcher's favor would have

negatively impacted all other candidates, male and female alike. Taken to its extreme, Plaintiff's

argument would have promotions determined by decision makers with no personal or professional

knowledge of *any* of the candidates. *Cf. Anderson*, 406 F.3d at 271. This point is borne out by the

proffered affidavit testimony of DNR Investigator Ray Lewis. Like Plaintiff, Lewis (a male) was an

unsuccessful candidate for the L-I position. In his affidavit, Lewis testified that he believed that *he*

had been at a disadvantage to obtain the position because Pritcher had a close relationship with

Sullivan, and Lewis believed Pritcher would be chosen. ECF No. 50-36.

36

Welch was placed on the Panel because of her HR experience. The undersigned has reviewed her deposition testimony and her interview notes and finds nothing suggesting she was not qualified to make promotion decisions.

In short, none of the arguments Plaintiff has presented convince the undersigned that Plaintiff has demonstrated pretext sufficient to survive summary judgment.

In addition, as Defendant has argued, the Fourth Circuit Court of Appeals has recognized the illogic of suggesting that the same person who hires or promotes an individual with knowledge of the individual's protected status would then fire, demote, or otherwise discriminate against the individual a short time later because of that status. Here, Sullivan was the hiring manager who chose Plaintiff as an Investigator in 2007. He also nominated and supported Plaintiff for the 2009 Officer of the Year award. In this situation, "there is a 'powerful inference' that the failure to promote her was not motivated by discriminatory animus." *Evans*, 80 F.3d 954, 959 (4th Cir. 1996), citing and quoting *Proud v. Stone*, 945 F.2d 796, 797-798 (4th Cir. 1991) ("where the hirer and the firer are the same individual . . . a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer.").[13]

IV.     Conclusion

At bottom, DNR has provided cogent nondiscriminatory business reasons for its promotion-selection process and for its business choice to promote Pritcher over Plaintiff. Pritcher had the longest tenure of any investigator in the Investigations Section, and he received higher scores than Plaintiff in the interviews. *See Bailey v. Anne Arundel Cnty., Md.*, 259 F. Supp. 2d 421, 427 (D. Md. 2003) ("That other applicants received higher scores than [the plaintiff] is a legitimate reason" for finding plaintiff ineligible for a promotion.). The statistical evidence presented by Plaintiff lacks sufficient foundation and thus provides no appropriate evidence that could be considered to

---

[13] Defendant raised this point in their principal memorandum, and Plaintiff did not take issue with it in her opposition memorandum.

demonstrate pretext. Similarly unavailing is the evidence contained in the affidavits of other employees—both those of non-decision makers offering their personal opinions as to the relative qualifications of Pritcher and Plaintiff and those suggesting DNR has a history of discriminating against women when making hiring and promotion decisions.

For the reasons set forth above, the undersigned recommends Defendant's Motion for Summary Judgment, ECF No. 46, be granted and this case be ended.

IT IS SO RECOMMENDED.

May 17, 2016                                    Kaymani D. West
Florence, South Carolina                        United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**